Ethan M. Posner (*Pro Hac Vice*)
eposner@cov.com
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: 202.662.5317
Facsimile: 202.662.6291

Sara J. O'Connell (Bar No. 238328)
soconnell@cov.com
COVINGTON & BURLING LLP
9191 Towne Centre Drive, 6th Floor
San Diego, CA 92122-1225
Telephone: 858.678.1811
Facsimile: 858. 678.1600

W. Douglas Sprague (Bar No. 202121)
dsprague@cov.com
COVINGTON & BURLING LLP
One Front Street
San Francisco, CA 94111-5356
Telephone: 415.591.7097
Facsimile: 415.591.6091

Attorneys for Defendant
LEONARD GLENN FRANCIS

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>LEONARD GLENN FRANCIS (1),<br><br>Defendant. | Case No.:  3:13-cr-03782-JLS<br><br>Related cases:<br><br>  No. 3:13-cr-03781-JLS<br>  No. 3:13-cr-04287-JLS<br><br>**REPLY TO GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT LEONARD GLENN FRANCIS'S MOTION FOR RELEASE** |

## I. Introduction

The government's opposition elides the fact that two material aspects of this case have changed since the last time the Court considered release: the defendant is facing substantially less prison time than before, and the extraordinary issues in the Sealed Addendum strongly favor release. Eighteen months ago, the government argued to this Court that Mr. Francis faced "life" in prison, but it cannot be disputed that the changed circumstances in the Sealed Addendum — and as detailed in the complete plea agreement — mean the defendant is facing a fraction of that time now.

Second, regarding the issues in the Sealed Addendum, the government concedes those issues are relevant to release, but contends incorrectly that they relate to an irrelevant standard. If anything, the cases involving these issues favor release under an even tougher standard than this defendant needs to satisfy. *Compare* 18 U.S.C. § 3143(a), *with id.* § 3145(c); *see also* Sealed Addendum at 3. If the defendants in those cases satisfied the tougher standard for release — in which they had to demonstrate exceptional circumstances, which this defendant does not — then the issues cited in the Sealed Addendum favor release even more strongly here.

Third, the government fails to note that while the standard for release is different upon conviction, several cases cited by Mr. Francis involve defendants who refused to accept responsibility, were convicted only after trial, and who still were released pending sentencing. *See, e.g.*, *United States v. Simels*, No. 1:08-cr-00640-DLI, Dkt. Nos. 8, 176, 177, 203 (E.D.N.Y. 2009). Mr. Francis's changed circumstances weigh even more heavily in favor of release, because he did not deny responsibility and force the government to trial. Instead, he has accepted responsibility and demonstrated that he remains committed to all his obligations under his plea agreement.

Finally, although unnecessary, Mr. Francis has submitted conditions that not only will reasonably assure his appearance, but effectively will guarantee it, thus more than carrying his burden. Instead of addressing those conditions, offering any inadequacies in them, or providing an example of where even less restrictive conditions have failed, the

1

government resorts to an extraordinary "debtors' prison" argument.  We are aware of no case — and certainly the United States cited none — suggesting that the existence of a coincident forfeiture order bars the defendant from expending personal funds to assure his appearance to allay the concerns of the government.  This "you are spending my money" argument by the government is not a consideration in the Bail Reform Act, which focuses on the flight risk issue.   These security measures are unnecessary; Mr. Francis is not a flight risk.  Nevertheless, Mr. Francis proposes such measures to demonstrate his commitment to continuing to accept responsibility and his willingness to subject himself to stringent conditions, as well as to eliminate any perceived risk of flight.

Mr. Francis has carried his burden and should be released pending sentencing.

## II.   Fundamental Changes In This Case Favor Release

This case is fundamentally different from the time that Mr. Francis last asked for release from this Court.  Mr. Francis has taken responsibility for his actions by pleading guilty.  As the government acknowledges, *see* U.S. Response in Opp. to Def.'s Mot. for Release Pending Sentencing [Dkt. No. 207] at 6, Mr. Francis, true to his word, made a substantial restitution payment of $5,000,000 to the government prior to sentencing.  Counsel is aware of no case in which a defendant has made such a pre-sentence restitution payment pending sentencing while remaining in custody.  This factor speaks volumes about Mr. Francis's character and his commitment to following through on *all* the terms of his plea agreement.

### A.   The Government Is Wrong About Mr. Francis's Potential Sentence

The government incorrectly contends that "the punishment that Defendant now faces is more severe" than at the time of his last request for release, based on a comparison of Mr. Francis's current statutory maximum sentence to what would have been his statutory maximum sentence at the time of his last request motion for a bond order.  *See* Dkt. No. 207 at 10.  But during Mr. Francis's last bond hearing before this Court, the government repeatedly emphasized that Mr. Francis was facing *life in prison*.

*See* Tr. of Bond Hr'g dated Nov. 25, 2013 [Dkt. No. 76] at 5:13-19 ("[A]s I've made this point in our brief, the guidelines recommend the most severe punishment for the defendant . . . . the guidelines recommend a minimum and a maximum sentence of life."); *see also id.* at 6:6-10 ("Somebody who was convicted of trafficking . . . even a thousand kilos of meth or heroin or cocaine would not face a guideline sentence as severe as Mr. Francis faces."). If these claims were ever accurate, they certainly are not now.

The government similarly pounded this "life in prison" claim before the Court of Appeals. *See* U.S.'s Response to Appellant's FRAP 9 Opening Br. [Dkt. No. 13-1 in Case No. 13-50589], dated Dec. 27, 2013, at 17 ("Even at the lowest Criminal History Category, the guidelines recommend a sentencing range of 'life.' That is, the guidelines recommend a minimum (and a maximum) lifetime custodial term of imprisonment . . . . the guidelines still prescribe a minimum sentence of 'life.'"); *id.* at 28 ("The only thing standing between Francis and his freedom – as opposed to the prospect of life in prison . . . ."). Moreover, at the time of his last request for release, the government argued that there was *no statutory maximum sentence at all*. *See id.* at 18` ("Practically speaking, therefore, the statutory maximums do not impose a limit on the custodial time Francis faces."); *id.* at 18 n.10 ("The Court . . . should consider . . . the total penalty [Francis] potentially faces, rather than limiting that penalty to the maximum prescribed by the pending counts.").

Now, as the government notes, the advisory Sentencing Guidelines range of imprisonment, before any departures or variances, is approximately fifteen to eighteen years. There is no more "life in prison" claim to support the government's flight risk argument, much less the impossible claim that Mr. Francis's custodial exposure has *increased*. Mr. Francis confronts a markedly *reduced* custodial exposure, which significantly alters the risk of flight analysis in Mr. Francis's favor.

### B. The Facts In The Addendum Support Release Even Under a More Burdensome Standard

The government does not take issue with the facts in the Addendum. Instead, the government incorrectly suggests that a different standard applies. To begin, the Defendant's opening brief cites the proper standard for release pending sentencing under 18 U.S.C. § 3143(a)(1). *See* Dkt. No. 200-1 at 5-6.

The government's argument misses the point that the cases under 18 U.S.C. § 3145(c) discuss a higher hurdle than Mr. Francis faces for defendants who have committed certain offenses. Under that standard, a defendant must show by clear and convincing evidence that he is not likely to flee or pose a danger to the safety to any other person or the community *and* show "exceptional reasons" justifying release. *See* 18 U.S.C. § 3145(c). As the cases cited in the Sealed Addendum make clear, courts have considered matters discussed in the Sealed Addendum when ordering release under section 3145(c)'s more onerous standard. If the defendant satisfies the more onerous standard — and the government essentially does not dispute the facts set forth in the Addendum — then he should be able to satisfy the less onerous standard present in this motion. The matters discussed in the Sealed Addendum go to Mr. Francis's history and characteristics — and support a conclusion that he is not a flight risk.

The government also does not dispute the defendant's health issues. As Mr. Francis laid out in detail in the Sealed Addendum, his health demonstrates he is not likely — or able — to flee or to live life as a fugitive. While the government attempts to downplay the severity of Mr. Francis's health issues, *see* Dkt. No. 207 at 16 n.8, Mr. Francis's physical condition bears on release, *see* 18 U.S.C. § 3142(g)(3)(A). Here, the only conclusion that can be drawn from his physical condition is that Mr. Francis is not a flight risk. Remaining at GEO, a temporary facility ill-equipped to handle even Mr. Francis's basic dental needs, is simply not a long-term solution until Mr. Francis's sentencing, currently scheduled for October and which may not occur even then.

Similarly, Mr. Francis is a large-in-stature, globally recognized figure. Each new development in the government's investigation increases his public profile and makes it even more implausible that life on the run is even a remote possibility. Mr. Francis is well aware of this. His personal characteristics thus make clear that Mr. Francis is not a flight risk.

### C. The Government Incorrectly Claims There Have Been No Changes To Facts Supporting the "History and Characteristics" Factor

The government erroneously assesses that many relevant facts underlying the "History and Characteristics" factor of 18 U.S.C. § 3142(g)(3) remain "unchanged," and therefore may remain unexamined for the purposes of Mr. Francis's instant request for release on bond. For example:

> 1. The government claims that Mr. Francis's business is still headquartered in Singapore. *See* Dkt. No. 207 at 11.

This is incorrect. The business is ruined and defunct, and it has no physical or operational headquarters any longer.

> 2. The government claims that Mr. Francis's B-1/B-2 visa has expired. *See* Dkt. No. 207 at 11.

This is incorrect. Mr. Francis's visa does not expire until 2019 (and his passport is still valid, too).[1] And immigration-status-based arguments by the government are a red herring, because the prosecutors may foreclose any potential immigration problems that they invent or envision. For example, regardless of his current visa status, the United States Department of Justice may assure Mr. Francis's ability to lawfully remain in the United States pending sentencing by facilitating the issuance of a new visa.

---

[1] It is correct that his visits to the United States under the visa are limited to six months' in duration.

      3.      The government refers to the sale of a GDMA-owned port to argue that "having failed to account for the $85 million sale proceeds of just one of his assets, it appears obvious that Defendant continues to have the means to abscond from the United States to havens abroad." *See* Dkt. No. 207 at 13.

This is misleading. The government cites to a news article regarding the sale of the Port Klang Cruise Center in support of the assertion that Mr. Francis "failed to account for the $85 million sale proceeds" from that sale, *see* Dkt. No. 207 at 12-13, 13 n.4, but the government failed to note that it has been informed that Mr. Francis never obtained or had access to that large amount of "proceeds."[2] This is because GDMA's own purchase of the port had been highly leveraged, and much of the so-called "proceeds" from the port sale were used to repay those outstanding loans, as well as real property taxes relating to the sale, conveyancing fees for the sale, and other fees. Notably, the same news article cited by the government to show that GDMA sold the port also explains that GDMA and the Port Klang Cruise Center had been placed under receivership. *See* Marhalim Abas, *Boustead Bought Over Port Klang Cruise Terminal*, Malaysian Defence, Aug. 4, 2014, http://www.malaysiandefence.com/?p=4675.

      4.      The government claims that Mr. Francis "has the ability to travel internationally, to move assets, to readily adapt to life in other countries, and to quickly find a safe haven outside the United States." *See* Dkt. No. 207 at 11.

This is misleading and pure speculation. Given Mr. Francis's failing health, increased recognition internationally, substantially diminished finances, willingness to sign extradition agreements, and consistent interest in maintaining strong family ties, such an imagined flight is not feasible. The government relies only on conjecture in

---

[2] Counsel for Mr. Francis made detailed presentations to the government regarding the status of Mr. Francis's known finances, including a statement of account from the firm that handled the port sale.

making this argument, and does not cite to any case featuring an individual released on bond conditions similar to those proposed by Mr. Francis and who attempted to flee. Similarly, the government fails to explain how it imagines Mr. Francis would "travel internationally," "readily adapt to life in other countries," or "quickly find a safe haven outside the United States."

### D. Mr. Francis Proposes Reasonable—Though Unnecessary—Security Measures That Go Far Beyond Reasonably Assuring His Appearance In All Proceedings

For the reasons set forth in the Memorandum and Sealed Addendum, and described above, the security measures Mr. Francis proposes are unnecessary because he will not flee. Nonetheless, Mr. Francis anticipated that the government would disagree. For this reason, Mr. Francis proposes measures designed to all but guarantee that he will appear as required. That Mr. Francis is willing to subject himself to these security measures demonstrates that he is committed to meeting all obligations under the plea agreement. In short, if the Court deems stringent security measures necessary, Mr. Francis proposes options from which the Court can choose to "reasonably assure the appearance" of Mr. Francis at all future proceedings. *See, e.g.*, 18 U.S.C. § 3142(c)(1).

Despite the government's claims to the contrary, the proposed conditions are more robust than what has been proposed previously. For example, these conditions now include detailed information about the proposed guard service, as well as a waiver of extradition. *See* Dkt. 200-1 at 15-16. It is also telling that the government does not argue that these measures are inadequate, nor can the government cite a case in which even less stringent conditions have failed.

Instead, the government argues that Mr. Francis's security measures necessarily result in diminishment of the money that Mr. Francis would be able to pay as restitution. Dkt. No. 207 at 14. This is a prohibited debtor's prison argument. Taken to its logical conclusion, the government's argument would mean that release pending sentencing with security conditions paid for by the defendant is never an option for a defendant facing a

restitution order.  The government cites nothing in the Bail Reform Act or case law that suggests that this is true.³  It is not.  The only relevant issue is flight risk, not whether funds expended to secure his appearance may somehow come out funds from a forfeiture order.

Should the Court share the government's concerns about these costs, however, Mr. Francis may have friends who are willing and able to cover some or all of the expenses related to the conditions that he proposes.  This vitiates the government's argument that Mr. Francis's funds will be diminished via the security measures.  This also avoids any concerns raised by the government that payment for security measures would potentially breach his plea agreement.⁴

Finally, the government contends that Mr. Francis has declined to provide security proposals to the Court, suggesting a nefarious motive to conceal the cost of these proposals.  Dkt. No. 207 at 14.  Mr. Francis is happy to provide the Court with a proposal that is tailored to the security measures that the Court chooses to impose.  As the Court likely appreciates, the cost of any particular security proposal varies based on the measures included.  Once any appropriate security measures are ordered by the Court, Mr. Francis will expeditiously arrange and provide a revised security proposal including

---

³ The government also overstates the financial impact of Mr. Francis proposed security measures.  On average, it costs the United States more than $30,000 a year to house a federal inmate.  *See* Annual Determination of Average Cost of Incarceration, 80 Fed. Reg. 12523, 12523 (Mar. 9, 2015).  Given his health issues, it may cost even more to house Mr. Francis.  These costs would be nonexistent under Mr. Francis's proposal.  The net difference in funds coming into the government, if any, is not as great as the government suggests.

⁴ And the government is wrong that spending money on a security company may violate the terms of Mr. Francis's plea agreement.  There is nothing in the plea agreement that would prohibit this.

those measures for approval by the Court.  In any event, the cost of a security proposal simply is not relevant to whether Mr. Francis is a flight risk.

### III.  Conclusion

Mr. Francis is not going anywhere.  Mr. Francis's circumstances are fundamentally different from the last time the Court addressed release.  He has proven his reliability and demonstrated his commitment to fulfilling his promises.  His financial resources are substantially diminished.  He has taken responsibility for his actions, including by making a substantial restitution payment to the government.  Mr. Francis's health has deteriorated since he was incarcerated more than twenty months ago.  This reality, coupled with his public profile, which grows with each new development in this case, makes flight an unrealistic possibility.  It is clear that Mr. Francis is not a flight risk. And, while they are unnecessary, conditions may be imposed to assure Mr. Francis's appearance at all proceedings.  Mr. Francis has met his burden, and he respectfully requests that the Court grant him release pending sentencing.

Dated:  May 28, 2015

*/s/ Sara J O'Connell*
Ethan M. Posner
Sara J. O'Connell
W. Douglas Sprague
LEONARD GLENN FRANCIS